UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CASSANDRA M. MENOKEN,<br><br>Plaintiff,<br><br>v.<br><br>DAN G. BLAIR, Acting Director, United States Office of Personnel Management,<br><br>Defendant. | Civil Action 03-01775 (HHK) |

**MEMORANDUM OPINION AND ORDER**

Cassandra M. Menoken ("Menoken"), a black female attorney employed at the Equal Employment Opportunity Commission ("EEOC") who seeks to be a federal Administrative Law Judge ("ALJ"), brings this action against the United States Office of Personnel Management ("OPM"). Menoken alleges that OPM failed to comply with an EEOC order requiring it to stop using a particular component of the ALJ examination that discriminates against black ALJ applicants. She also charges that OPM's design, implementation and/or administration of the ALJ application process unlawfully discriminates against blacks and females. Menoken brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the court is Menoken's motion for partial summary judgment (Dkt. # 22). Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that Menoken's motion must be denied.

## I. BACKGROUND

Individuals interested in becoming ALJs must first take an examination designed, administered, and scored by OPM. The exam consists of four parts: (1) a Supplemental Qualifications Statement ("SQS"); (2) a written demonstration; (3) a Personal Reference Inquiry ("PRI"); and (4) a panel interview. Upon completion of all parts of the exam, applicants receive a final numerical rating from 70 to 100, which is then adjusted for veteran's preference where applicable. Those applicants with a qualifying final rating are placed on the register of eligibles to be referred to agencies to be considered for appointment to vacant positions. OPM does not select ALJs from the list of applicants, rather it is the agencies that are responsible for the ultimate hiring decision.

In April 1993 Menoken participated in the aforementioned examination process. Menoken did not believe her final score on the examination adequately reflected her qualifications, and as a result, filed a number of appeals with the ALJ Ratings Appeal Panel. On May 20, 1994, she filed a formal complaint with the EEOC alleging that the 1993 ALJ selection process was designed and administered to have an unlawful disparate impact on female and black applicants. She also alleged that OPM discriminated against her based on her race and sex, and retaliated against her based on her decision to engage in protected EEO activity. After pursuing her administrative remedies, Menoken remained unsatisfied and initiated a civil lawsuit.[1]

---

[1] While the majority of Menoken's claims were unsuccessful at the administrative level, Menoken prevailed on a claim involving the use of a particular benchmark as part of the ALJ application process—"partner in a large law firm." The Administrative Judge ("AJ") that presided over Menoken's hearing agreed with Menoken that the utilization of this particular benchmark on the SQS impermissibly created a disparate impact on the basis of race. On July 29, 2001, the AJ ordered OPM "to cease use of that benchmark until its use has been properly validated . . . or until the disparate impact disappears." Def's. Mot. to Dismiss, Ex. I at 27. The

Menoken now pursues three causes of action. First, she alleges that OPM failed to comply with the AJ's order for it to "'cease' and correct discrimination against African American ALJ applicants." Am. Compl. at 11. Second, she asserts that the SQS and PRI components of the ALJ examination unlawfully discriminate against, and have an unlawful disparate impact on, African Americans in general and on her in particular. *Id.* Third, she charges that the geographic preference form used to identify where those individuals on the ALJ register are willing to work has an unlawful disparate impact on women in general and on her in particular. *Id.*

## II.  ANALYSIS

Menoken seeks partial summary judgment[2] with respect to a portion of OPM's Ninth Defense, which states that: "The Administrative Law Judge examination is properly validated and does not have disparate impact on the basis of race or gender." Answer at 2. According to Menoken, the ALJ examination is invalid and therefore OPM should be precluded from asserting

---

AJ also ordered OPM to post and provide notice to agencies of the discriminatory benchmark and his order. *See id.* On August 8, 2001, OPM issued a final order stating that it would fully implement the AJ's decision.

[2] Under FED. R. CIV. P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50.

that the examination was properly validated. In support of her argument, Menoken relies principally on three points (1) that OPM had a mistaken understanding of how validity is measured under Title VII when it initially developed the exam; (2) that the process OPM used to develop the ALJ examination ran counter to methods generally accepted by professionals in the field; and (3) that the ALJ examination does not "actually measure" the qualifications necessary to adequately fulfill the duties associated with serving as an ALJ. Pl.'s Mot. at 2.

OPM opposes summary judgment and raises as a threshold matter the propriety of Menoken's motion at this stage of the litigation. OPM argues that it is not obligated to demonstrate that the ALJ examination is sufficiently related to the skills and knowledge required to act as an ALJ until Menoken satisfies her initial burden of proffering evidence that the facially neutral ALJ exam had a disparate impact on a protected class of individuals. OPM is correct.

The burden-shifting framework established by Title VII is well-settled. "In order to prove disparate impact under Title VII, the Plaintiffs must first make out a *prima facie* case of discrimination, *i.e.*, show that 'the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.'" *Rudder v. Dist. of Columbia*, 890 F. Supp. 23, 38 (D.D.C. 1995) (*quoting Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). Typically this showing is made through the submission of statistical evidence that compares the relevant populations and the effect of the employment practice at issue. *See, e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988) ("The evidence in these "disparate impact" cases usually focuses on statistical disparities . . . ."). Once a plaintiff demonstrates this *prima facie* case of discrimination, the burden then shifts to the employer to

demonstrate that the challenged practice or policy is "job related for the position in question and consistent with business necessity." *Anderson v. Zubieta*, 180 F.3d 329, 338–39 (D.C. Cir. 1999) (*quoting* 42 U.S.C. § 2000e-2(k)(1)(A)(i) and citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)); *see also 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 2006 WL 954582, at *3 (D.C. Cir. Apr. 14, 2006).

    Here, Menoken has not directed the court's attention to any evidence that would allow the court to conclude that she has satisfied her initial burden.  While Menoken suggests that "'expressions of concern' over the ethnic and gender makeup of the ALJ ranks," Pl.'s Mot. at 5, permeate the record, this type of conjecture and innuendo is insufficient evidence of a disparate impact.  The shortcoming in Menoken's showing stems, in large part, from Menoken's failure to address the question.  Instead, she has chosen to focus on what should be the second question to which the court turns its attention.  Were the court to consider Menoken's challenge to the content of the ALJ examination at the present time the court would strip OPM of its opportunity to contest that the ALJ examination creates a disparate impact, a right OPM is afforded.  *See* 42 U.S.C. § 2000e-2(k)(1)(B)(ii) ("If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such a practice is required by business necessity.").

    Because Menoken has yet to make her *prima facie* showing, it would be imprudent to attempt to resolve questions concerning whether or not the ALJ examination has "a manifest relationship to the employment in question," *Griggs*, 401 U.S. at 432, the second stage of the required analysis.  Menoken's motion for partial summary judgment, therefore, is properly

denied for this reason alone. Were the court, however, to consider the merits of Menoken's motion, the court would conclude still that OPM has raised a number of material questions of fact that would preclude finding the ALJ examination invalid as a matter of law.

Menoken's initial basis for arguing the invalidity of the ALJ examination is that OPM designed the ALJ examination with a flawed understanding of the required relationship between the content of the exam and the demands of the position. According to Menoken, OPM believed that the examination need only have "a rational relationship" to the position at issue. However, Menoken argues that the proper standard mandates that the examination be constructed such that it "actually measures" the knowledge, skills, or abilities necessary to adequately perform the job.

With respect to the proper standard to be utilized when developing the examination, Menoken is indeed correct. Title VII demands that an employment test with an adverse impact on racial minorities be discarded unless the employer makes a showing that the examination is "demonstrably a reasonable measure of job performance." *Griggs*, 401 U.S. at 436. In order to satisfy this burden, an employer must demonstrate that the examination is "job-related." *See Albermarle*, 422 U.S. 425–26. The Equal Opportunity Commission ("EEOC") has propagated detailed guidelines that define "job-relatedness" and require validation pursuant to professionally developed testing standards for employment tests with an adverse impact. *See* Uniform Guidelines on Employment Selection Procedures, 29 C.F.R. Ch. XIV ("Uniform Guidelines"); *Albermarle*, 422 U.S. at 430–31; *Griggs*, 401 U.S. at 436. Menoken does not believe that OPM followed these guidelines when it developed the ALJ examination.

Menoken cites the testimony of Dr. Amiel Sharon, an individual that assisted in the design of the 1980 ALJ examination, for the proposition that OPM constructed the ALJ

examination to have merely a "rational relationship" to the ALJ position. Specifically, Menoken relies on the following excerpt from Dr. Sharon's testimony at Menoken's administrative hearing:

> Menoken: And you testified that the examination is valid because it bears a rational relationship to the job in question?
>
> Dr. Sharon: Yes.
>
> Menoken: And you believe that rational relationship is the standard used under the guidelines?
>
> Dr. Sharon: Yes.

Pl.'s Mot., Ex. A at 130 (EEOC Hearing Transcript, Vol. 8). However, this statement is contradicted by later testimony which indicates to the court that during the development of the ALJ examination OPM endeavored to create an exam that had more than a "rational relationship" to working as an ALJ. Dr. Sharon testified as follows:

> Dr. Sharon: [W]hat I'm saying is that we used . . . [a] content validity strategy to demonstrate that, in fact, the selection procedure is related to successful performance in a job. So, it's not merely showing the—a rational relationship; we have demonstrated that using the content validity procedure that is one of the three procedures called for by the guidelines as showing that it's related to successful performance on the job.

*Id.* at 131.

Moreover, though Menoken focuses her attention on the development of the ALJ examination in 1980, OPM has provided the court with evidence that OPM conducted an additional validation study in 1990, as well as a number of interim reviews of the ALJ examination. *See* Def.'s Opp., Ex. 10 (1990 Validation Study). As indicated in Dr. Sharon's testimony, OPM employed the Uniform Guideline-sanctioned "content validation" method, *see*

29 C.F.R. § 1607.14(C)(1), in the development of the exam in 1980, as well as in the validation study performed in 1990.³  Therefore, there is at least a question as to whether the standard used in these studies was in violation of the Uniform Guidelines.

Finally, the remaining issues that Menoken insists undermine the validity of the ALJ examination would not be sufficient as a matter of law to satisfy her burden.  Among the alleged flaws in the ALJ examination cited by Menoken are OPM's failure to verify the information submitted by candidates as part of the SQS portion of the exam, and OPM's requirement that graders score each item in an applicant's SQS in isolation, without reference to later answers. Pl.'s Mot. at 15–17.  Even assuming *arguendo* that these procedures violate the Uniform Guidelines, the court observes that "it is not clear that strict adherence to the 'intricate details' of the Guidelines is mandatory under Title VII." *Rudder*, 890 F. Supp. at 41 (*quoting Guardians Ass'n, Inc. v. Civil Service Comm'n of New York*, 630 F.2d 79, 91 (2d Cir. 1980)).  As the

---

³ The Uniform Guidelines permit employers to rely on one of three different studies when validating their selection procedures: content validity studies, criterion validity studies, or construct validity studies.  29 C.F.R. § 1607.5(A).  Each study explores a different facet of the relationship between an examination and job-relatedness:

> Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance.  Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated.  Evidence of the validity of a test or other selection procedure through a construct validity study should consist of data showing that the procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important in successful performance in the job for which the candidates are to be evaluated.

29 C.F.R. § 1607.5(B).

Second Circuit explained in *Guardians Ass'n*, "[T]he Guidelines should always be considered, but they should not be regarded as conclusive unless reason and statutory interpretation support their conclusions." 630 F.2d at 91. OPM has submitted evidence, including the 1990 validation study, that could permit a finder of fact to conclude that it substantially complied with the Uniform Guidelines. Whatever deviations Menoken has highlighted would not be sufficient to find the ALJ examination invalid as a matter of law.

### III. CONCLUSION

For the aforementioned reasons, it is this 26th day of April, 2006, hereby

**ORDERED** that Menoken's motion for partial summary judgment [Dkt. # 22], is **DENIED**.

                                                          Henry H. Kennedy, Jr.
                                                          United States District Judge